JOHN H. KOHLER, petitioner-respondent,

*v.*

EDNA T. KOHLER, defendant-appellant.

[Submitted December 11th, 1922.  Decided March 5th, 1923.]

1. In an action for divorce on the ground of desertion, after the statutory period of two years immediately following the act of desertion has expired, and no effort in good faith by the offending party has been made to return to the deserted home and to renew cohabitation, the right to return has gone, the benefit given by the statute to the party offended against has become vested, and he or she can never be deprived of his or her right to a divorce, except by his or her own act.

2. A, wife deserted her husband and refused to live with him thereafter notwithstanding reasonable effort on his part to induce her to do so.  Her desertion was willful and obstinate, and continued for the statutory period of two years, less two days.  On the second day before the right of the husband to a divorce became complete she met him at a base ball game and there expressed to him a desire to resume their matrimonial relations.—*Held*, that, under the evidence, her offer to return was not made in good faith and did not stay the running of the statute against her.

*94 N. J. Eq.*                    Kohler *v.* Kohler.

The following opinion was prepared by the late Judge Robert Williams, in compliance with the assignment to him. It clearly expresses the view of the court upon the matters involved in the litigation, and is adopted by the court as its own opinion in the cause.

On appeal from the court of chancery.

*Messrs. Waddington & Matthews,* for the defendant-appellant.

*Mr. Wilbert V. Pike,* for the petitioner-respondent.

The opinion of the court was delivered by

WILLIAMS, J.

This is an appeal from a decree of the court of chancery, divorcing the petitioner, John Kohler, from his wife, Edna T. Kohler, on the ground of desertion. The case was heard before Norman Gray, advisory master, but no opinion was filed. The parties were married March 5th, 1916, and lived together until June 17th, 1919. On this day the wife left her husband's home, and never afterward returned to it except once, about a month after she left, taking a constable with her, for the purpose of removing some of the household goods which she claimed to own. The petition was filed July 23d, 1921, one month and six days after the expiration of the two-year period. The wife denied the desertion, and filed a counter petition, charging her husband with adultery with one Ethel Smith. The cross petition was dismissed by the master, and a reading of the testimony shows that there was no evidence upon which it could have been sustained.

There was one child, a boy, four years of age at the time of filing the bill; he was taken by his mother and has lived with her since the separation. It is quite evident that the married life of these parties, at least toward the end of the period when they lived together, was unhappy, and that both

parties were to blame for this condition. The wife, in her testimony, charges the husband with unnatural practices, but he denies this, and although he was not everything that a husband ought to be and his treatment of his wife was frequently unkind, nothing was proved against him which would justify her in leaving him. After the separation he did everything that a husband could be asked to do, in reason, to induce his wife to return to his home, and the advances that he made looking to this object satisfied him that further effort on·his part would be unavailing. The wife informed him that she had left him for good and made the same statement to other witnesses; he·tendered her money for the support of herself and child, but she refused. It cannot be said, therefore, that the husband is not entitled to a divorce because of his failure to make reasonable effort to induce his wife to return.

It was attempted to be proved on the part of the defendant that just before the lapse of the two-year period, which both parties agreed was June 17th, 1921, she attended revival meetings held at Alloway, from May 29th to June 19th, 1921, and that, as a result of her change of heart, she concluded that she ought to return to her husband, and volunteered to him to do so, but that he refused to listen to her proposition. She says it was on June 15th, 1921, because she remembered that his right to a divorce would be complete on the 17th, two years after she left him, and he says it was June 18th, 1921, because it was the day after the two-year limit expired. It is a curious thing that her repentance, if she did repent, came at the very end of the two years fixed by the statute; it is also curious that both parties had so clearly in their minds the last day of grace existing in favor of the wife. If he is right as to the date, then, under our decision in *Gordon* v. *Gordon, 89 N. J. Eq. 535,* her repentance came too late; his right to a divorce had become vested, and nothing that she could afterward do could deprive him of the enforcement of that right. The chief justice in *Gordon* v. *Gordon, supra* (in explaining

*Myles* v. *Myles,* *77 N. J. Eq.* *265*) says: "During the whole of the two years immediately following the act of desertion the offending spouse is offered an opportunity of repenting of his or her sin, and may put an end to the running of the statute by exhibiting such repentance to his or her wife or husband, and offering in good faith to return to the deserted home and to renew cohabitation. But if he or she declines to take advantage of the opportunity to repent offered by the statute, and persists in the desertion for the full period of two years, the right to return has gone, the hour of repentance has passed, the benefit given by the statute to the spouse offended against has become vested and he or she can never thereafter be deprived of that benefit—of his or her right to a divorce—except by his or her own act. Repentance by the sinner, offers of return by him or her, are then of no avail."

If the husband is right as to the date, then that ends the matter. The question of date therefore becomes important. The alleged offer of repentance and to return was made at a base ball game, about five o'clock in the evening; the minister of the Baptist church at which the revival meetings were held testified that the date was between the 5th and 19th of June, 1921, because it was in the last two weeks of the evangelist's stay in Alloway, and that four or five games of base ball were played a week; it was also testified that the week day games, as distinguished from Saturdays, were known as "twilight games" at this season of the year. The petitioner himself testified as to this as follows:

"*Q.* And do you recall whether it was a Saturday or day during the week?

"*A.* Let me see, I just don't remember whether it was a day during the week. It was a day during the week. I will tell you why I know it, because it was in the evening.

"*Q.* And you were playing twilight games down there then?

"*A.* Yes, sir."

June 18th, 1921, was on a Saturday, and the petitioner is therefore wrong as to his date, as he admits the game was played on a week day. The defendant testifies that the date

was June 15th, which would be on a Wednesday, and that is within the two weeks' period from June 5th to 19th as testified to by the minister. The burden was upon the petitioner to prove his case, and all uncertainties of fact should be resolved against him. Assuming that the date fixed by the wife, June 15th, 1921, is correct, and which would be within the two-year period, we must consider whether the offer of repentance and to return, made at such a late date, and at such a place as a public base ball game, was made in good faith.

The defendant testified upon direct examination, that she was at the base ball game on June 15th, 1921; that she had had a talk with Mr. Graham, the minister, about joining the church and that she desired to do so, and she afterwards had a talk with her husband.

"*Q.* And what was the conversation you had with him at the ball game?

"*A.* I asked him to take me back.

"*Q.* And what was his answer to you?

"*A.* 'No, I couldn't see it that way.'

"*Q.* And did you endeavor to have further conversation with him?

"*A.* No, I didn't bother after that, after I met him down to the ball game and had a talk with him there, I didn't."

Upon cross-examination she testified that she thought she could not join the church until she had had a talk with her husband; that she wanted to ascertain from him whether or not he would meet her at some other time and talk the matter over; that she wanted to make arrangements for him to meet her so she could have a talk about it, and he refused to do it.

The petitioner testified that she said: "I am going to join the church. Will you forgive me for what I have done," and he replied, "Do as you please. I won't do nothing for you. I won't do anything against you."

The minister testified that the defendant had asked him if he would see her husband and ask him to meet her with regard to talking over the matter of the reconciliation; that he had a conversation at the ball game and after talking with him the husband said he thought it would be useless to talk

the thing over with his wife; that he had given her her opportunity before and he thought it would be useless, any further conversation. That later in the day the petitioner came around taking the collection as he generally did at the game. The defendant stopped him; he was close enough to overhear parts of the conversation and that the purport of it was that she wanted to meet him or to·have a further meeting another time to talk the thing over; he did not hear his reply and this was about half an hour after he had talked to petitioner.

This conversation took place at a ball game; the defendant was standing with some others back of a wire backstop, and the petitioner came by with his hat in hand taking up a collection to defray the expenses of the game: the defendant put in her contribution and stopped him, as he was passing, to speak to him. It was certainly a strange place to seek a reconciliation, at a ball game, during the progress of the game and when her husband was taking up a collection and surrounded by people. Instead of seeking him out with the proposition, she ran across him, almost by accident, and took occasion to speak to him as he was passing by.

Taking all the circumstances and surroundings of the case, her state of mind during a religious revival where she thought it necessary to ask her husband's forgiveness before she could join the church, the casual way in which she met and spoke to him and made no further effort to have the talk with him she asked for, in a more suitable place and at a more suitable time, as she had another full day by her own reckoning, it is more probable that the offer she made was to ease her conscience for her past actions, than a genuine offer in good faith to go back to the deserted home and to renew cohabitation with her husband, a man whom she accused of unnatural practices, adultery and abusive language, and whom she had persistently ignored up to within a day or two of the expiration of the two-year period.

In our opinion this offer to return, considering the circumstances surrounding it, was not a genuine offer in good

faith to go back to the deserted home and to renew cohabitation, and a careful consideration of the proofs submitted leads us to the conclusion that this decree should be affirmed.

*For affirmance*—THE CHIEF-JUSTICE, SWAYZE, TRENCHARD, PARKER, BERGEN, KALISCH, BLACK, KATZENBACH, WHITE, GARDNER, ACKERSON, VAN BUSKIRK—12.

*For reversal*—None.